IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEYON PAYLOR,

       *Plaintiff*,

  v.                      Civil No.: 1:24-cv-02746-JRR

BALTIMORE POLICE DEPARTMENT,
*et al.*,

       *Defendants*.

## MEMORANDUM OPINION

Pending before the court are Defendant Baltimore Police Department's ("BPD") Motion to Dismiss (ECF No. 14); Defendants Timothy Romeo, John Burns, and Jordan Moore's Partial Motion to Dismiss (ECF No. 15); and Defendant Daniel Hersl's Partial Motion to Dismiss (ECF No. 17). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, BPD's Motion (ECF No. 14) will be granted in part and denied in part and Officer Defendants' Motions (ECF Nos. 15, 17) will be granted.

## I.    BACKGROUND[1]

### A. Plaintiff's Arrest and Conviction

On January 2, 2014, Plaintiff Keyon Paylor was on his porch of the home that he shared with his mother, stepfather, sister, and nephew, when Defendants Hersl, Romeo, Burns, and Moore ("Officer Defendants") approached the home.[2] (ECF No. 1 ¶¶ 12, 15–16.) After entering the home to speak to his stepfather, Plaintiff exited the home through the front door while Officer

---

[1] For purposes of resolving the Motion, the court accepts as true all well-pled facts in set forth in the Complaint (ECF No. 1). *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

[2] Plaintiff avers that, prior to the incident at issue in this action, Defendant Hersl had previously arrested him, put him in his police car, and planted drugs on his person. (ECF No. 1 ¶¶ 25–26.)

Defendants ran into the home without any legal basis.  *Id.* ¶ 17–18.  After entering the home, Defendant Burns went upstairs and took approximately $4,500 to $5,000 from Plaintiff's room. *Id.* ¶ 20.  Defendant Burns then told the other Officer Defendants to take Plaintiff outside.  *Id.* ¶ 21.  Once outside, an Officer Defendant lifted a seat cushion from a chair on the porch to reveal a black handgun.  *Id.* ¶ 22.  The handgun did not belong to Plaintiff; he told Officer Defendants the same.  *Id.*  According to Plaintiff, Officer Defendants "fabricated that they had seen [him] put the handgun under the seat cushion, when they had not," and "Defendant Hersl memorialized this fabrication in an Incident Report and Statement of Probable Cause."  (ECF No. 1 ¶ 23.)

As a result of the fabricated story, Officer Defendants arrested and charged Plaintiff with a crime he did not commit.  *Id.* ¶ 24.  He was indicted on a federal charge of felon in possession of a weapon and ammunition.  *Id.* ¶¶ 24, 27.  Contemporaneous with his arrest, Plaintiff made statements affirming his innocence.  *Id.* ¶¶ 27–30.  Despite knowing that Officer Defendants were lying, Plaintiff ultimately pled guilty to the charged offense out of concern that "it would be his word against theirs" and that he would face additional time for allegedly violating his state probation in an unrelated state case.  *Id.* ¶¶ 31–33.  Plaintiff was ultimately sentenced to five years on his federal charge and time served on his state charges.  *Id.* ¶ 33.

Plaintiff later filed a motion to vacate his conviction, in which the Government joined. (ECF No. 1 ¶¶ 69–70.)  On March 3, 2024, the district court granted Plaintiff's motion, vacated his conviction, and dismissed the indictment against him.  *Id.* ¶ 71.  As a result of the "false and fabricated charges against him," Plaintiff "suffered significant physical and emotional pain and suffering," including missing out on the opportunity to be with his family and children, and "liv[ing] life as an autonomous and free human being."  *Id.* ¶ 72.

### B. Federal Charges and Conviction of Defendant Hersl

Defendant Hersl and other officers of the (now disbanded) BPD Gun Trace Task Force ("GTTF") were the subjects of a federal criminal investigation. (ECF No. 1 ¶ 34.) As part of that investigation, Assistant United States Attorneys spoke with Plaintiff and had him testify before the grand jury about his unlawful arrest.[3] *Id.* "On or about February 23, 2017, Defendant Hersl was indicted for federal racketeering conspiracies, including by committing extortion, robbery, claiming fraudulent overtime and filing false reports and affidavits." *Id.* ¶ 39. Less than a year later, he "was convicted of RICO conspiracy and Hobbs Act robbery." *Id.* ¶ 41. At his trial, the Government put on evidence that Defendant Hersl (among other BPD officers) "had a practice of stealing money, property and drugs by unlawfully detaining and/or arresting victims, entering their homes, and then authoring false documents—incident and arrest reports, reports of property seized, and charging documents—to cover up their misconduct," including testimony that Defendants Hersl and Romeo took money from a number of specific individuals in the course of arrest. *Id.* ¶¶ 40, 42–43.

"By 2014, Defendant Hersl and other BPD officers amassed dozens of complaints," including allegations that Defendant Hersl physically abused citizens and targeted innocent people. *Id.* ¶ 45. Prosecutors that investigated the GTTF "estimated 1,700 cases [were] impacted by the misconduct." *Id.* ¶ 47. Further still, "the practice of framing innocent people was carried out and accepted by other BPD officers," in addition to those on the GTTF, including Officer Defendants. *Id.* ¶ 48.

---

[3] As a result of Plaintiff's assistance in the investigation, the Government moved for relief from judgment under Federal Rule of Criminal Procedure 35 to reduce Plaintiff's federal sentence to time served, but Plaintiff "declined the relief because he was innocent and wanted to clear his name, and because he was concerned that the Officer Defendants would retaliate against him." (ECF No. 1 ¶¶ 37–38.)

### C. BPD's Longstanding Policies and Practices

Plaintiff alleges that the constitutional violations he suffered "were not isolated events"; rather they were "the result of the BPD's longstanding policies and practices of falsely arresting, prosecuting, and convicting individuals through profoundly flawed investigations." (ECF No. 1 ¶ 52.)  Following the GTTF prosecutions, Steptoe and Johnson, a law firm, conducted an investigation of BPD.  The resultant investigation report (the "Steptoe Report") revealed  BPD policies and practices of "allowing its plainclothes officers to fabricate justifications for stops, arrests, and seizures," "ignor[ing] and fail[ing] to intervene or report when the same officers stole money and drugs during those stops, arrests, and seizures," and "fabricat[ing] an observation—e.g., of drugs or weapons—entirely." *Id.* ¶¶ 53–54.  The Steptoe Report found "that this corruption was 'casual, routine and pervasive—and carried with it no consequences.'"  *Id.* ¶ 55.

The Steptoe Report cited "several causes of this longstanding corruption."  *Id.* ¶ 56.  The first identified cause was a failure of supervision—supervisors were "inexperienced," "lacked rigor," received inadequate training from BPD, were generally unwilling to examine the behavior of subordinate officers, and "were aware of their subordinates' misconduct . . . but . . . did nothing to stop it."  *Id.* ¶¶ 56–57.  The second identified cause was "the primacy and pressure to produce arrests."  *Id.* ¶ 58.

Echoing the Steptoe Report findings, Plaintiff alleges:

> Between 2000 and 2017, BPD leadership created pressure—particularly on plainclothes officers, just like the Officer Defendants—to maximize the number of arrests, and gun and drug seizures. The success or failure of a particular unit or officer depended almost exclusively on the number of arrests made, or guns or drugs seized. In order to achieve those numbers, officers would cross the line and fabricate evidence.

(ECF No. 1 ¶ 58.)  Plaintiff further alleges that "[i]n a survey conducted in 2000, nearly one quarter of BPD officers [reported believing] that another quarter of their fellow officers were stealing money or drugs from arrestees."  *Id.* ¶ 59.  Plaintiff cites to numerous examples of BPD officers, detailing conduct that includes "sealing money from suspects on the streets or in their homes," *id.*, carrying an extra weapon or BB gun in case they needed to plant the gun to justify their actions, *id.* ¶ 60, and doing same after using force in their pursuit of a purported suspect, *id.* ¶ 61.[4]

The third identified cause cited by the Steptoe Report was lack of accountability.  (ECF No. 1 ¶ 62.)  Plaintiff offers:

> Internal Affairs ("IA") was deprived of leadership, resources, and talent. The quality of investigators assigned to IA was poor, exacerbated by the fact that the investigators received no training, and IA had no standard operating procedures or operations manual. IA investigations were often leaked to the alleged offender and any punishment suggested by IA reduced by leadership.

*Id.*  Plaintiff cites specific examples, including IA's failure to investigate an allegation that an officer had "a known criminal" living in his basement; instead IA investigated the officer who reported the misconduct.  Worse still, according to the Complaint, BPD took no action to conduct an internal review after two officers were arrested for robbing drug dealers and selling the stolen drugs.  *Id.* ¶¶ 63, 65.  In sum, Plaintiff alleges, "[a]t all relevant times, BPD failed to discipline its officers or hold officers accountable for their misconduct."  *Id.* ¶ 64.

The fourth identified cause set forth in the Steptoe Report was inadequate training of officers.  *Id.* ¶ 66.  Plaintiff alleges:

> This failure started at the very beginning—at BPD's Police Academy, where recruits were pushed through by turning a blind eye to recruits cheating on exams, and even when there were significant red flags that indicated the recruits should not be hired. In addition, once recruits left the Academy there was little, if any,

---

[4] BPD contends that the allegation that the man was "ultimately killed" is factually incorrect.  (ECF No. 14-1 at p. 10 n.4.)

> formal training. Instead, officers learned from their peers, which all but guaranteed that unconstitutional practices would be continued. One example that Steptoe highlighted was that new officers learned to conduct stops and make arrests without a sufficient factual or legal basis from their more experienced peers.

*Id.* "Each of these shortcomings [was] well-known to policymakers;" yet the policymakers "were deliberately indifferent to the violation of constitutional rights described herein and condoned the practices described above." *Id.* ¶ 67. Plaintiff avers that the policymakers who condoned these practices caused his injuries. *Id.*

## D. Procedural History

On September 24, 2024, Plaintiff filed the instant action in this court, asserting the following counts:

> Count I: Violation of Due Process, 42 U.S.C. § 1983, against Officer Defendants;
>
> Count II: Federal Malicious Prosecution and Unlawful Pretrial Detention, 42 U.S.C. § 1983, against Officer Defendants;
>
> Count III: Failure to Intervene, 42 U.S.C. § 1983, against Officer Defendants;
>
> Count IV: Federal Conspiracy, 42 U.S.C. § 1983, against Officer Defendants;
>
> Count V: *Monell*[5] Policy Claims, 42 U.S.C. § 1983, against BPD;
>
> Count VI: Malicious Prosecution against Officer Defendants
>
> Count VII: Intentional Infliction of Emotional Distress ("IIED") against Officer Defendants;
>
> Count VIII: Civil Conspiracy against Officer Defendants

---

[5] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978).

<u>Count IX</u>: Violation of Article 24 of the Maryland Declaration of Rights against Officer Defendants; and

<u>Count X</u>: Indemnification against BPD.

(ECF No. 1 ¶¶ 74–130.)

All Defendants now move to dismiss; BPD seeks dismissal of Counts V and X, and Officer Defendants seek dismissal of Counts IV and VIII.[6]  (ECF Nos. 14, 15, 17.)

## II.    <u>LEGAL STANDARD</u>[7]

Pursuant to Federal Rule of Civil Procedure 8(a), a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction."  FED. R. CIV. P. 8(a)(1).  The purpose is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).  A motion asserted under Federal Rule of Civil Procedure 12(b)(6) "test[s] the sufficiency of a complaint;" it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Therefore, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the

---

[6] In its Motion, BPD's "factual background" section includes few (if any) of Plaintiff's allegations set forth in his Complaint.  (ECF No. 14-1 at pp. 2–4.)  Instead, BPD cites almost exclusively to *United States v. Paylor*, 88 F.4th 553 (4th Cir. 2023), in which the Fourth Circuit vacated the district court's order denying Plaintiff's 18 U.S.C. § 2255 petition.  The Fourth Circuit's recitation of facts set forth in Plaintiff's criminal case has little bearing on the court's consideration of BPD's Motion in view of Plaintiff's allegations.  To the extent BPD papers are intended to suggest Plaintiff's Complaint allegations lack credibility, except to the extent a plaintiff's allegations fail to raise a "plausible" claim, generalized issues of credibility are not properly resolved on a Rule 12(b)(6) motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (regarding judicial scrutiny of a complaint on a 12(b)(6) motion), *infra*.

[7] Defendants Romeo, Burns, and Moore cite Rule 12(b)(1) in the introduction of their Motion (ECF No. 15 at p. 1), but advance no argument under Rule 12(b)(1) or otherwise challenge this court's jurisdiction.  (ECF No. 15-1.)  The court thus analyzes all Motions pursuant to Rule 12(b)(6).  Further, the court independently discerns no basis on which to dismiss the Complaint for lack of subject matter jurisdiction.

plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "[A] complaint that provides no more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 8:21-CV-01637-PX, 2021 WL 5326463, at *2 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

III.   **ANALYSIS**

As discussed above, Defendants all move for dismissal of certain claims asserted against them—BPD seeks dismissal of Plaintiff's *Monell* claim and claim for indemnification; Officer Defendants all seek dismissal of Plaintiff's conspiracy claims. (ECF Nos. 14, 15, 17.) Plaintiff opposes BPD's Motion but concedes that his civil conspiracy claims are barred. (ECF No. 23 at p. 1; ECF No. 1 at p. 16 n.1.)

### A.  Counts IV and VIII: Conspiracy Claims

Officer Defendants all move to dismiss Plaintiff's conspiracy claims (Counts IV and VIII), averring that the claims are barred by operation of the intracorporate conspiracy doctrine.[8] Plaintiff "concede[s] . . . that the intracorporate conspiracy doctrine currently bars [his conspiracy] claims, and only pled them in the event that the Fourth Circuit reverses that doctrine."  (ECF No. 23 at p. 1; ECF No. 1 at p. 16 n.1.)

"The intracorporate conspiracy doctrine maintains that because the acts of corporate agents are legally attributed to the corporation itself, 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.'"  *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 357-58 (D. Md. 2022) (quoting *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986)).  "Subject to certain exceptions, the intracorporate conspiracy doctrine '[i]n essence, [ ] means that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.'"  *Id.* (quoting *Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).  Plaintiff does not contend any exception applies here.

As Plaintiff concedes his conspiracy claims are barred by operation of the intracorporate conspiracy doctrine, and the court discerns no material change in relevant Fourth Circuit law since the parties' briefing, the court will dismiss the conspiracy claims without prejudice.

### B.  Count V: *Monell* Claim

As relayed above, in *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included

---

[8] Defendant Hersl also argues that Plaintiff cannot assert "civil conspiracy" as an independent tort.  (ECF No. 17-1 at pp. 5–6.)  Because Plaintiff concedes that dismissal of these claims is proper on Officer Defendants' intracorporate conspiracy doctrine argument, the court does not address Defendant Hersl's argument regarding the viability of a stand-alone claim for civil conspiracy.

among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). The Court further explained that "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.*

In asserting a *Monell* claim, a plaintiff must "adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Such claims consist of two components: "(1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Saltz v. City of Frederick, MD*, 538 F. Supp. 3d 510, 554 (D. Md. 2021) (citing *Bd. of Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 403 (1997)). A policy or custom that purports to give rise to liability will "not, however, 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'" *Id.* (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984)). The municipality's alleged conduct must demonstrate "'deliberate indifference' to the rights of its inhabitants." *Id.* (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)). Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final

> policymaking authority; (3) through an omission, such as a failure
> to properly train officers, that manifest[s] deliberate indifference to
> the rights of citizens; or (4) through a practice that is so persistent
> and widespread as to constitute a custom or usage with the force of
> law.[9]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).  *Monell* claims have three essential elements: (1) identification of a specific "policy or "custom"; (2) attribution of the policy, and fault for its creation, to the municipality; and (3) an "affirmative link" between an identified policy or custom and a specific rights violation.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

"Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 403 (4th Cir. 2014).  *Monell* claims survive the motion to dismiss stage if the plaintiff alleges facts to support that the defendant "was aware of ongoing constitutional violations" and "did nothing to stop or correct those actions."  *Smith v. Aita*, No. CV CCB-14-3487, 2016 WL 3693713, at *4 (D. Md. July 12, 2016), *aff'd*, 711 F. App'x 163 (4th Cir. 2018); *see Garcia v. Montgomery Cnty., Md.*, No. CIV. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013) (denying motion to dismiss where plaintiff alleged defendant "was aware of the ongoing constitutional violations by [] officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop").  Still, while it is true that often "a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery" and that "courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers," "boilerplate

---

[9] As discussed in more detail below, the fourth type is commonly referred to as a "condonation theory" of liability.

allegations will not suffice." *Saltz v. City of Frederick, MD*, 538 F. Supp. 3d 510, 556–57 (D. Md. 2021).

BPD seeks dismissal of Plaintiff's *Monell* claim, asserting that he fails to allege a plausible claim under each theory.[10]    The court considers the challenges below.

a.  Official Action of Municipal Officials with Final Policymaking Authority

"[A] municipality can be held liable for constitutional harms stemming from a policy or custom instituted by the 'official actions' of municipal officials with 'final policymaking authority,' or those officials who 'have the responsibility and authority to implement *final* municipal policy with respect to a particular course of action.'" *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 308 (D. Md. 2020) (emphasis in original) (quoting *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 522-23 (4th Cir. 2000)).  "A 'governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances' so long as that governmental unit possessed 'final authority to create official policy.'" *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554 (4th Cir. 2018) (emphasis in original) (citing *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

"[I]n assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses

---

[10] BPD also offers a somewhat rote argument that Plaintiff fails to allege causation, asserting, in full:

> Plaintiff's Complaint contains numerous vague, conclusory, and unsupported allegations regarding policies, decisions by policymakers, and training deficiencies. *See gen.* Comp.    However, at no point does he allege that any of these were the "moving force" behind the violation of his rights. *See* Connick, 563 U.S. at 60-61. BPD can only be liable for the alleged unconstitutional conduct described in the complaint if BPD itself caused the constitutional violation. *Canton*, 489 U.S. at 385.  Because Plaintiff has failed to allege such causation, his claims of *Monell* liability by BPD fail as a matter of law.

(ECF No. 14-1 at p. 11.)  The court thus considers whether Plaintiff has pled sufficient facts under each theory advanced to show an "'affirmative link' between an identified policy or custom and a specific rights violation." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

12

final authority to establish municipal policy with respect to the action ordered.'" *Id.* at 554–55 (citing *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). "If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy." *Id.* at 555 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). "A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lytle v. Doyle*, 326 F.3d 463, 472 (4th Cir. 2003). As with all *Monell* claims, reliance on a final policymaker theory requires identification of the specific policy, attribution of the policy to the municipality, and an affirmative link between the policy and the plaintiff's specific rights violation. *See Spell*, 824 F.2d at 1389, *supra*.

BPD argues that Plaintiff does not state a plausible *Monell* claim based on such a theory because he fails to allege "(1) which specific policy is unconstitutional, (2) exactly who, within the BPD, instituted the policy, and (3) why that individual (or group of individuals) had final policymaking authority." (ECF No. 14-1 at p. 8.) Plaintiff details a number of allegedly unconstitutional policies, including those related to false arrest, prosecution, and conviction of individuals following flawed investigations; fabrication of grounds for stops, arrests, and seizures; reliance on fabricated evidence (like police reports); and failure to stop (or report) the officers who stole money and drugs during those stops, arrests, and seizures, or to turn over exculpatory evidence. (ECF No. 1 ¶¶ 52, 54, 106.) Plaintiff, however, alleges minimal facts to link the aforementioned policies to the decisions of final policymakers. The sole allegation appears to be that all of the aforementioned unconstitutional policies and practices "were ratified by policymakers with final policymaking authority." *Id.* ¶ 106. Even assuming without finding that

13

Plaintiff's failure to identify a specific final policymaker or position is not fatal to his claim,[11] his Complaint lacks sufficient factual allegations to allege plausibly that final policymakers themselves instituted the aforementioned policies. Indeed, his claim that the final policymakers ratified such policies based on their pervasive character lends itself to a condonation theory but offers scant, if any, basis for the court to find it plausible that a final policymaker directly implemented the policies.

For the foregoing reasons, the court will grant the Motion to the extent it seeks dismissal of Plaintiff's *Monell* claim based on implementation of an official policy by a final policymaker.

b. Custom by Condonation

BPD also challenges Plaintiff's *Monell* claim to the extent he brings it pursuant to a condonation theory. Specifically, BPD argues Plaintiff does not allege a pattern of prior unconstitutional conduct related to his allegations. (ECF No. 14-1 at p. 8–10.)

Under a theory of "custom by condonation," a municipality violates § 1983 if "municipal policy makers fail to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389-90 (4th Cir. 1987)) (citations omitted); *see also Monell v. Dep't of Soc. Servs.,*, 436 U.S. 658, 690-91 (1978) (holding that "'[o]fficial policy' is not the only basis

---

[11] Courts in this circuit have reached different conclusions when confronted with this question, often depending on the fact-specific circumstances of the case. *Compare Jackson v. Town of Farmville*, No. 3:22CV729, 2023 WL 3871697, at *5 (E.D. Va. June 7, 2023) (holding that a plaintiff who did not identify a person with final policymaking authority "cannot bring a *Monell* claim premised on these insufficient pleadings"); and *Lucero v. Early*, No. CV GLR-13-1036, 2018 WL 4333745, at *7 (D. Md. Sept. 11, 2018) (holding that a plaintiff failed to allege sufficiently "that an official with final policymaking authority implemented the policy" where he failed to attribute the policy to BPD or Baltimore City); *with Est. of Bryant v. Baltimore Police Dep't*, No. CV ELH-19-384, 2020 WL 673571, at *35–36 (D. Md. Feb. 10, 2020) (holding that, despite a plaintiff's failure to identify a specific final decisionmaker, the plaintiff's other allegations related to the policies were "sufficient to put the BPD on notice of the nature of the claims against it and allow it to prepare an adequate defense"). *See also Groden v. City of Dallas, Texas*, 826 F.3d 280, 284 (5th Cir. 2016) (holding "the specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable").

for imposing municipal liability.  'Custom, or usage,' in the exact language of § 1983, may also serve.  And the existence of such a 'custom or usage' may be found in 'persistent and widespread . . . practices of [municipal] officials [which] although not authorized by written law, [are] so permanent and well-settled as to [have] the force of law'") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).  "Under the 'condonation' theory, unlike the 'express policy' theory, a plaintiff need not reference any specific written policy when making their claim—instead, it is sufficient to plead sufficient facts that demonstrate the existence of a widespread pattern or practice."  *Corbitt v. Baltimore City Police Dep't*, No. CV RDB-20-3431, 2022 WL 846209, at *9 (D. Md. Mar. 22, 2022).

To state a *Monell* claim based on condonation, "[a] plaintiff must point to a persistent and widespread practice[] of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference."  *Owens*, 767 F.3d at 402 (citation omitted).  "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only support his condonation claim with facts which, if true, 'state a claim to relief that is plausible on its face.'"  *Jones v. Jordan*, No. CV GLR-16-2662, 2017 WL 4122795, at *9 (D. Md. Sept. 18, 2017) (quoting *Owens*, 767 F.3d at 403, that "simply alleging" a *Monell* claim is easier than prevailing on the merits).  "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct."  *Owens*, 767 F.3d at 402–403 (quoting *Spell*, 824 F.2d at 1391).

"Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will."  *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387).  Further, a policy or custom that gives rise to § 1983 liability will not "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees."  *Milligan v.*

15

*Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). "Only when a municipality's conduct demonstrates a 'deliberate indifference' to the rights of its inhabitants can the conduct be properly thought as a 'policy or custom' actionable under § 1983." *Nicholson v. Baltimore Police Dep't*, No. CV DKC 20-3146, 2021 WL 1541667, at *8 (D. Md. Apr. 20, 2021) (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)). "To plead deliberate indifference, plaintiff need only allege that the municipality was aware of the alleged pattern or practice and 'that the municipality's failure to discipline its officers 'allowed' a custom, policy or practice 'of [constitutional] violations to develop.'" *Corbitt*, 2022 WL 846209, at *9 (quoting *Jordan*, 2017 WL 4122795, at *10).

By way of example, in *Owens*, the Fourth Circuit concluded that the plaintiff's "brief, but non-conclusory" allegations were sufficient to allege a plausible pervasive practice of misconduct, explaining:

> In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it."

767 F.3d 379, 403 (4th Cir. 2014).

BPD contends that Plaintiff's allegations are insufficient here because he "does not allege a single incident, prior to his 2014 arrest, where an officer fabricated evidence or stole money from a suspect," and that his reliance on the Steptoe Report is insufficient, as it was published after Plaintiff's arrest. (ECF No. 14-1 at p. 9–10.) Contrary to BPD's contention, Plaintiff's Complaint

is replete (at least compared to *Owens*) with allegations of unconstitutional conduct, including allegations similar to the circumstances alleged by Plaintiff regarding his own experiences.

Plaintiff specifically alleges conduct around the time of his arrest—including Defendants Hersl and Romeo stealing money from a man during a 2014 arrest, and Defendants Hersl and Burns stealing money and planting drugs on a man to cover up their misconduct in 2015.[12] (ECF No. 1 ¶¶ 42–43.) More broadly, Plaintiff alleges that "[b]y 2014, Defendant Hersl and other BPD officers amassed dozens of complaints," including allegations that Defendant Hersl physically abused citizens and targeted innocent people. *Id.* ¶ 45. He further alleges that an estimated 1,700 cases were impacted by misconduct of Defendant Hersl and the GTTF. *Id.* ¶ 48. He alleges that Hersl's "corruption" was reported in newspapers "as early as 2006 and well into the next decade." *Id.* ¶ 49. On top of this, Plaintiff references the Steptoe Report, which, while published later, details circumstances preceding and following Plaintiff's arrest, including allegations that "the problems of corruption and misconduct existed in the BPD well before the GTTF was created in 2007 and extended well beyond the GTTF," detailing plainclothes officers' use of fabricated justifications for stops, other officers' failure to intervene and report same, and supervisor awareness of same and inaction. (ECF No. 1 ¶ 54, 57.) Plaintiff also asserts that, according to a 2000 survey, almost a quarter of BPD officers reportedly "believed that another quarter of their fellow officers were stealing money or drugs from arrestees." *Id.* ¶ 59.

Plaintiff's allegations are indeed more than sufficient to allege the presence of "widespread and flagrant" violations to support a showing that BPD was, at the time of the alleged incident here, aware of and allowed same, as well as an affirmative link between the aforementioned policies or customs and the alleged violations of Plaintiff's rights—a fabricated reason for

---

[12] Plaintiff also contends Defendant Hersl had planted drugs on him prior to the incident at issue. (ECF No. 1 ¶ 26.)

Plaintiff's arrest, stealing money, and failing to intervene. *See Owens*, 767 F.3d at 403 and *Spell*, 824 F.2d at 1389, *supra*. BPD's argument to the contrary neglects both material aspects of Plaintiff's allegations and controlling Fourth Circuit law that a plaintiff's "brief, but non-conclusory, allegations" of a pervasive practice are sufficient to state a claim and survive Rule 12(b)(6) dismissal. *See id.* The court will deny BPD's Motion to the extent it seeks dismissal of Plaintiff's *Monell* claim pursuant to condonation.

      c.  <u>Failure to Train, Supervise, and Discipline</u>

      BPD contends that Plaintiff "does not state a plausible claim for relief against BPD with respect to training, supervision[,] or discipline," because he does not "adequately identify any specific, factual bases for these claims and does not sufficiently plead any causal link between the actions of the named Defendant Officers and any failure(s) in BPD's training, supervision, or discipline that amount to a deliberate indifference to his constitutional rights." (ECF No. 14-1 at p. 11.)

      "A municipality can also be liable for an established policy through a failure to train, if it reflects a deliberate or conscious choice to not do so." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). BPD correctly notes that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).[13] "Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty.'" *Johnson*,

---

[13] "Although the procedural posture of this case distinguishes it from *Connick*, 563 U.S. 51 . . . , that case is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim." *Saltz v. City of Frederick, MD*, 538 F. Supp. 3d 510, 559 (D. Md. 2021).

452 F. Supp. 3d at 309 (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir. 1987)).

Ultimately, "[a] failure to train *Monell* theory requires a plausible demonstration that (1) the nature

of the training was insufficient in some particularized manner; (2) the insufficiency of the training

was a deliberate or conscious choice; and (3) a causal relationship existed between the failure-to-

train and the injuries suffered." *Palma v. Montgomery Cnty.*, 598 F. Supp. 3d 288, 298 (D. Md.

2022).

      "As to the first element, 'the plaintiff must point out a specific deficiency in training, rather

than general laxness or ineffectiveness in training.'" *Id.* (quoting *Washington v. Baltimore Police

Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020)); *see Spell*, 824 F.2d at 1390 ("[A] sufficiently

close causal link must be shown between potentially inculpating training deficiency or deficiencies

and specific violation.  This requires first that a specific deficiency rather than general laxness or

ineffectiveness in training be shown.").  Conclusory or broad-sweeping allegations of deficient

officer training that was a deliberate or conscious choice by the municipality and which resulted

in unconstitutional officer conduct are insufficient to state a claim.  *See, e.g.*, *Corbitt v. Baltimore

City Police Dep't*, No. CV RDB-20-3431, 2022 WL 846209, at *8 (D. Md. Mar. 22, 2022); *Devi

v. Prince George's Cnty.*, No. CV DKC 16-3790, 2017 WL 3592452, at *3 (D. Md. Aug. 21,

2017); *Jones v. Chapman*, No. CIV.A. ELH-14-2627, 2015 WL 4509871, at *18–20 (D. Md. July

24, 2015); *Hall v. Fabrizio*, No. CIV. JKB-12-754, 2012 WL 2905293, at *2 (D. Md. July 13,

2012).

      In *McDowell v. Grimes*, the court instructed:

> The nature of the training element requires more than bald assertions
> that police officers were not properly trained. It is not sufficient to
> state in broad, conclusory terms and in a variety of different ways
> that the police department failed to train and supervise its officers.
> Nor is alleging a general laxness or ineffectiveness sufficient to state
> a claim. Instead, a plaintiff must allege a specific deficiency with the

training.

*McDowell v. Grimes*, No. CV GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018) (citations omitted); *see Johnson*, 452 F. Supp. 3d at 309 ("No matter which theory is alleged, the plaintiff must point out 'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in training.'") (quoting *Spell*, 824 F.2d at 1390)). "[T]he municipality will only be liable if 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Johnson*, 452 F. Supp. 3d at 309 (quoting *Harris*, 489 U.S. at 390).

Here, Plaintiff pleads the following allegations in support of his claim based on a failure to train theory:

> [T]he Steptoe investigation found that there was inadequate training of officers. This failure started at the very beginning—at BPD's Police Academy, where recruits were pushed through by turning a blind eye to recruits cheating on exams, and even when there were significant red flags that indicated the recruits should not be hired. In addition, once recruits left the Academy there was little, if any, formal training. Instead, officers learned from their peers, which all but guaranteed that unconstitutional practices would be continued. One example that Steptoe highlighted was that new officers learned to conduct stops and make arrests without a sufficient factual or legal basis from their more experienced peers.

(ECF No. 1 ¶ 66.)

The court agrees with BPD that Plaintiff's sole allegation is not sufficient to allege a plausible *Monell* claim based on a failure to train theory. The allegation is insufficient in multiple ways. First, as to the "inadequate" or lack of "formal training," his assertion is exactly the sort of impermissible "general laxness or ineffectiveness in training" allegation, *see Palma*, 598 F. Supp. 3d at 298, *supra*, and lacks the requisite specificity. Second, that recruits were permitted to cheat

on exams during training lacks an affirmative link between that failure and Plaintiff's harm alleged here. Finally, Plaintiff's allegation that peers learned from other peers to conduct stops and make arrests without sufficient factual or legal bases is similarly insufficient because the allegations do not, without more, plausibly allege that BPD deliberately and consciously intended that result. The court will therefore grant BPD's Motion and dismiss Plaintiff's *Monell* claim to the extent it is based on a failure to train theory.

The court is not persuaded, however, that BPD's argument is similarly compelling as to Plaintiff's claims based on a failure to supervise and discipline. BPD's argument is conclusory in nature, focusing more on the training deficiencies than the alleged supervisory and disciplinary deficiencies. Nonetheless, the court considers the argument.

This court has previously recognized what it has referred to as "failure to supervise and discipline" theory of *Monell* liability. *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 536 (D. Md. 2020). "A failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'" *Id.* at 536–37 (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)). A plaintiff who fails "to allege widespread conduct by County employees that could support the inference that County policymakers were aware of and tacitly condoned" the unconstitutional violation by failing to supervise or discipline their employees is insufficient to "nudge [a] *Monell* claim 'across the line from conceivable to plausible.'" *Brown v. Bratton*, No. CV ELH-19-1450, 2020 WL 886142, at *35 (D. Md. Feb. 21, 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As to supervising and disciplinary action, Plaintiff alleges:

> 56. Steptoe focused on several causes of this longstanding corruption. First, the Steptoe investigation found that there was a failure of supervision. Supervisors were inexperienced and lacked rigor in their supervision. BPD failed to properly train supervisors,

and there was a general unwillingness among supervisors to closely examine the behavior of subordinate officers, particularly those who were generating impressive numbers of arrests and seizures of guns and drugs.

57. The Steptoe investigation found that supervisors were aware of their subordinates' misconduct—including making false arrests and lodging charges based on fabricated evidence— but they did nothing to stop it.

.            .            .

59. In a survey conducted in 2000, nearly one quarter of BPD officers believed that another quarter of their fellow officers were stealing money or drugs from arrestees. During the federal prosecution of certain GTTF officers, one co-defendant, Momodu Gondo, told federal agents that 70% of BPD plainclothes officers were stealing money from suspects on the streets or in their homes.

.            .            .

62. . . . Internal Affairs ("IA") was deprived of leadership, resources, and talent. The quality of investigators assigned to IA was poor, exacerbated by the fact that the investigators received no training, and IA had no standard operating procedures or operations manual. IA investigations were often leaked to the alleged offender and any punishment suggested by IA reduced by leadership.

63. For example, in 2012, a BPD officer reported another officer, Daniel Redd, for associating with a known criminal who was living in Redd's basement. Instead of investigating Redd, IA investigated the police officer who reported the misconduct.

64. At all relevant times, BPD failed to discipline its officers or hold officers accountable for their misconduct.

65. Worse yet, BPD failed to conduct any internal or external review or learn from scandals involving its officers. For example, in 2005, BPD officers William King and Antonio Murray were arrested for robbing drug dealers and selling the stolen drugs. According to the Steptoe report, their arrests caused "shockwaves," but nothing was done within BPD: There was never any institutional introspection, and no effort to review training, policies, or practices. The same thing happened when subsequent scandals came to light.

(ECF No. 1 ¶¶ 56–57, 59, 62–65.)

The allegations include, in some instances, specific time ranges, and describe others occurring throughout the existence of the GTTF. They include specific examples of how supervision and disciplinary action were deficient in such a widespread manner so as to allege plausibly that BPD was aware of same. This is sufficient, at this preliminary stage and in the absence of a more specific challenge from BPD, to state a *Monell* claim based on a failure to supervise and disciplinary theory.

BPD argues Plaintiff's allegations based upon the Steptoe Report should not be considered, except where those allegations are factual in nature. (ECF No. 14-1 at pp. 13–15.) To be sure, it is well-establish that legal conclusions unsupported by factual allegations are insufficient to state a claim. *See Iqbal*, 556 U.S. at 679, *supra*. BPD makes much of *Jones v. Jordan*, where, on a 12(b)(6) motion, the court "consider[ed] [the plaintiff's] allegations that rely on the DOJ report and accept[ed] them as true, to the extent that they [were] factual assertions." No. CV GLR-16-2662, 2017 WL 4122795, at *6 (D. Md. Sept. 18, 2017). BPD's reading ignores pertinent portions of the *Jones* court's analysis. For examples, the *Jones* court noted:

> Here, BPD argues that Jones does not identify the nature of any BPD training and only relies on the DOJ Report's legal conclusion that officers were incentivized to increase their arrest numbers during the relevant time period. The Court disagrees. Jones, quoting the DOJ Report, alleges that BPD "relies on deficient training on a broad array of substantive policing functions" and "numerous important topics," specifically pointing to lack of "proper[ ] train[ing]" on "use of force," "de-escalation," "stops, searches, and arrests," and "how to supervise and investigate misconduct." (Am. Compl. ¶ 88). Quoting the DOJ Report, Jones also pleads that BPD trained its officers to "prioritize short-term suppression, including aggressive use of stops, frisks, and misdemeanor arrests." (Id. ¶ 80).

> Thus, Jones does not simply state "in broad, conclusory terms" that BPD failed to train and supervise its officers, see Peters, 2014 WL 4855032 at *5, nor does he allege a "general laxness or ineffectiveness" with BPD's training, see Shields, 2016 WL 4581327, at *9 n.11. Rather, Jones states "the sort of training" that

> officers "actually receive:" training that teaches officers to prioritize
> short-term suppression and aggressively stop, frisk, and make
> misdemeanor arrests. See Jones, 2015 WL 4509871, at *20. Jones
> also identifies "specific deficienc[ies]" with the training: lack of
> proper training on use of force; de-escalation; stops, searches, and
> arrests; and how to supervise and investigate misconduct. See
> Shields, 2016 WL 4581327, at *9 n.11.

Id. at *6. Jones' allegations, while lacking in certain granular specificity, were indeed factual, and,

importantly, of the same nature and character asserted by Plaintiff here.

For example, Plaintiff alleges that BPD supervisors were inexperienced, not properly

trained, unwilling to examine the behavior of subordinates, and knew that their subordinates

"[made] false arrests and [lodged] charges based on fabricated evidence," but did nothing to stop

it.  (ECF No. 1 ¶¶ 56–57.)  These allegations, while perhaps broad, do not amount to a conclusory

assertion that supervision was inadequate; instead, Plaintiff's allegations delineate specific ways

in which supervision was flawed.  BPD seeks to impose a greater burden on Plaintiff than he is

required to bear at this stage; he need only state a plausible claim.[14]  Accordingly, the court will

deny the Motion to the extent it seeks dismissal of Plaintiff's Monell claim on this basis.

### C.  Count X: Indemnification Claim

BPD finally moves to dismiss Plaintiff's indemnification claim, arguing it is not ripe and

thus is not justiciable.  (ECF No. 14-1 at pp. 15–17.)  In the alternative, BPD seeks a stay of

Plaintiff's indemnification claim pending resolution of his claims against the Officer Defendants.

Id. at pp. 17–18.

---

[14] As this court explained in Jones v. Jordan: "This ruling is not to suggest that the DOJ Report, in whole or in part, is admissible at trial or may be considered for the purposes of a motion for summary judgment. The Court is merely accepting the well-pleaded allegations as true under Rule 12(b)(6)." No. CV GLR-16-2662, 2017 WL 4122795, at *6 n.8 (D. Md. Sept. 18, 2017).

"A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity." *DiPino v. Davis*, 354 Md. 18, 47 (1999). The Local Government Tort Claims Act ("LGTCA") provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." MD. CODE ANN., CTS. & JUD. PROC. § 5-303(b)(1). It "requires each county to provide limited indemnity to county employees for non-malicious tortious acts or omissions committed in the employees' scope of employment." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011). The LGTCA specifically identifies BPD as one such local government entity. MD. CODE ANN., CTS. & JUD. PROC. § 5-303(d)(21). Importantly, however, it does not "serve to create a cause of action against the local governments or their employees." *Rounds v. Maryland-Nat. Cap. Park & Plan. Comm'n*, 441 Md. 621, 640 (2015).

As BPD acknowledges, this court has previously recognized "that there is no case law 'preclud[ing] a plaintiff from pleading an indemnification claim before final judgment.'" *McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 288 (D. Md. 2020) (quoting *Johnson v. Baltimore Police Dep't*, No. CV ELH-19-00698, 2020 WL 1169739, at *38 (D. Md. Mar. 10, 2020)). The court, however, recognizes that it has previously reached different decisions when faced with a motion to dismiss an indemnification claim as premature. *Johnson*, 2020 WL 1169739, at *38; *see Truant v. Persuhn*, No. CV RDB-23-00579, 2023 WL 8600552, at *12 (D. Md. Dec. 12, 2023) (recognizing same); *Shipley v. Disney*, No. CV SAG-21-3173, 2022 WL 2789076, at *14 (D. Md. July 15, 2022) (recognizing same); *McPherson*, 494 F. Supp. 3d at 288

(recognizing same); *Est. of Bryant v. Baltimore Police Dep't*, No. CV ELH-19-384, 2020 WL

673571, at *43 (D. Md. Feb. 10, 2020) (recognizing same); *see also Thomas v. Baltimore Police

Dep't*, No. 23-CV-3379-BAH, 2025 WL 81950, at *10 (D. Md. Jan. 10, 2025) (explaining that,

where "the only claim Plaintiff asserts against BPD is an indemnification claim, the Court finds

that the claim is not yet ripe for judicial review"); *Simmons v. Baltimore City Police Dep't*, No.

21-CV-00969-LKG, 2023 WL 8452448, at *21 (D. Md. Dec. 6, 2023) (dismissing an

indemnification as not ripe for judicial review);

The court finds persuasive Judge Hollander's reasoning in *Johnson v. Baltimore Police

Departmentt*:

> Certainly, a judgment against a local government employee is a
> precondition to recovering against a local government under the
> LGTCA. *See id.* at 555, 197 A.3d at 597. And, other courts have
> dismissed an indemnification claim brought against the BPD as
> premature. *See Burgess II*, 2016 WL 795975, at *11 n.13
> (dismissing indemnification claim as premature); *Jones v. Ziegler*,
> 894 F. Supp. 880, 897 (D. Md. 1995) (same). But, permitting Mr.
> Johnson to plead an indemnification claim against the BPD at the
> outset avoids the possibility of redundant litigation, thereby
> facilitating the efficient resolution of this case. *See, e.g.*, Fed. R. Civ.
> P. 13(g) (allowing parties to file cross-claims for indemnification in
> pleadings). Indeed, for that reason, courts in this District have
> permitted the BPD to file a cross-claim for indemnification against
> an officer under Rule 13(g), seeking a declaration that it has no duty
> to indemnify despite the officer's liability not having been
> established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL
> 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting
> BPD's Cross-Claim to proceed directly behind [the plaintiff's]
> claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City
> Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md.
> July 24, 2019) (same). That approach makes good sense where, as
> here, "[d]etermining whether [the] Officer Defendants were acting
> within the scope of their employment will, in turn, determine
> whether BPD is liable for [the] Officer Defendants' actions."
> *Bumgardner*, 2019 WL 4115414, at *11.

2020 WL 1169739, at *38.

Where, as here, Plaintiff's *Monell* claim against BPD will continue, the court will decline to dismiss Plaintiff's indemnification claim as against BPD on grounds of ripeness. Of course, to prevail in such a claim, Plaintiff will ultimately need to (1) "successfully prove[] that the Officer Defendants committed the underlying torts alleged in this matter and he obtains a judgment," and (2) have this court find "that the officers acted within the scope of their employment." *Thomas*, 2025 WL 81950, at *10 (quoting *Grim v. Balt. Police Dep't.*, Civ. No. ELH-18-3864, 2019 WL 5865561, at * 27 (D. Md. Nov. 8. 2019)).

Alternatively, BPD asks the court, in essence, to bifurcate and stay Plaintiff's indemnification claim. Federal Rule of Civil Procedure 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED. R. CIV. P. 42(b). "Notably, Rule 42(b) is disjunctive, meaning '[o]nly one of these criteria need be met to justify bifurcation.'" *Saltz v. City of Frederick, MD*, 538 F. Supp. 3d 510, 561 (D. Md. 2021) (quoting *Saxion v. Titan-C-Mfg.*, 86 F.3d 553, 556 (6th Cir. 1996)). The decision to bifurcate claims for trial is committed to the court's "broad discretion." *Id.* (quoting *Beasley v. Kelly*, DKC-10-0049, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010)).

The court is persuaded that bifurcating and staying BPD's indemnification claim is proper here. As discussed above, indemnification under the LGTCA necessarily depends on a judgment against the local government employee, as well as other circumstances. *See Thomas*, 2025 WL 81950, at *10, *supra*. "[T]o the extent that any discovery would be required solely for the adjudication of the indemnification claim, it makes sense to stay the claim pending resolution of the claims against the BPD employee officers, absent specific permission from this Court to conduct the discovery sooner." *Shipley*, 2022 WL 2789076, at *14; *see also Thomas*, 2025 WL

27

81950, at *10 n.15 (recognizing that staying an indemnification claim can serve judicial economy); *Grim*, 2019 WL 5865561, at *28 (concluding that staying an indemnification claim was "reasonable"). Following this approach, the court is persuaded that staying the claim is reasonable and would serve the interests of judicial (and party) economy to the extent there is discovery to be had that relates solely to the adjudication of the indemnification claim. It will therefore grant BPD's request to stay Plaintiff's indemnification claim pending resolution of his claims against Officer Defendants.

## IV.    <u>CONCLUSION</u>

For the reasons set forth herein, by separate order, Officer Defendants' Motions (ECF Nos. 15, 17) will be granted and BPD's Motion (ECF No. 14) will be granted in part and denied in part. The court will dismiss Counts IV and VIII as against Officer Defendants and Count V as against BPD to the extent it is based on final policymaker or failure to train theories.[15] The court will also bifurcate and stay Count X.

August 11, 2025                                     /S/

                                                   _____
                                                   Julie R. Rubin
                                                   United States District Judge

---

[15] Defendants seek dismissal with prejudice. The court declines to dismiss this action with prejudice. *See Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 292 (4th Cir. 2018) (stating that "the nature of dismissal" is left to "the sound discretion of the district court").